639 P.2d 569

**TEXAS NATIONAL THEATRES, INC.,
Plaintiff-Appellant,**

v.

**CITY OF ALBUQUERQUE, et al.,
Defendants-Appellee.**

No. 13463.

Supreme Court of New Mexico.

Jan. 6, 1982.

Rehearing Denied Jan. 20, 1982.

Michael E. Vigil and Jeffrey Libit, Albuquerque, Arthur M. Schwartz, Denver, Colo., for plaintiff-appellant.

Pat Bryan, City Atty., Anita P. Miller, Asst. City Atty., Albuquerque, for appellees.

## OPINION

SOSA, Senior Justice.

This is an appeal from the district court's order granting a permanent injunction against plaintiff-appellant Texas National Theatres, Inc. (TNT), prohibiting it from operating the 66 Drive-In Theatre (66) as an "adult theater" until such time as the 66 is granted a special use permit by defendant-appellee City of Albuquerque (City).

The property on which the 66 is located was zoned Special Use (SU–1) as a drive-in theatre pursuant to a site development plan submitted on behalf of the 66 and approved by the City in 1964. There were no restrictions on the content of the movies to be shown at the 66 under the 1964 SU–1 permit. Albuquerque, N. M., Comprehensive Zoning Ordinance, § 15(B)(6) (rev. ed.

1962). In 1977, the City Council enacted the Adult Entertainment Facilities Ordinance, No. 26–1977 (effective May 11, 1977), amending the Comprehensive City Zoning Code, ALBUQUERQUE, N.M., REV. ORDINANCES, ch. 7, (1974) (hereinafter Code). The amendment regulates adult establishments, listing adult drive-in theatres as special uses, provided they are not located within 500 feet of a residential zone. § 30(B)(10)(d)(1).

■ The trial court impliedly found that, as of the effective date of the amendment, the 66 became a nonconforming structure as to use because it was an adult theatre located within 500 feet of a residential zone. "Non-conforming" is defined by the Code as "a structure or use of structure or land which does not conform to this ordinance and which was in conformity with any zoning ordinance in effect at the time it was created." § 5(B)(56). The general rule is that nonconforming uses existing at the time of the effective date of a zoning ordinance may be continued. 8A E. McQUILLEN, THE LAW OF MUNICIPAL CORPORATIONS § 25.180 (3d rev. ed. 1976). The City allowed the 66 to continue operation under its SU–1 permit regardless of the type of movies shown.

The court concluded that the 66 abandoned its nonconforming use status between 1978 and 1980 by no longer showing adult movies. The court went on to find that there was a change in use from a "regular" to an "adult" drive-in theatre in 1980 when TNT subleased the 66 and began showing adult movies. Based upon this finding, the court concluded that TNT violated the Code by operating an adult theatre within 500 feet of a residential zone and by failing to amend its site development plan as required to obtain a special use permit as an adult theatre. TNT appeals the decision of the lower court. We affirm.

The issues on appeal are:

(1) Whether the Code provision pertaining to the 500 foot restriction is unconstitutionally vague and therefore invalid because the Code fails to specify the manner in which the distance is to be measured.

(2) Whether the court properly concluded that the 66 abandoned its pre-existing nonconforming use status as an adult theatre.

(3) Whether there is substantial evidence to support the court's finding of a change in use from a "regular" to an "adult" drive-in theatre, thereby necessitating an amendment to the site development plan.

The 66 had been operated as a drive-in theatre by Commonwealth Theatres, Inc. from 1964 until September of 1979. Prior to the effective date of the 1977 Code amendment, a variety of films were shown at the 66, some of which contained an emphasis on material depicting or relating to "specified anatomical areas" or "specified sexual activities" as defined by the amended Code. § 5(B)(93) and (94). Accordingly, the 66 was classified by the City as an "adult theater," defined by Section 5(B)(4) of the Code as:

> [A] theater, including a drive-in theater, used for presenting material distinguished or characterized by an *emphasis on* matter depicting, describing, or relating to *specified sexual activities or specified anatomical areas* for observation by patrons therein. [Emphasis added.]

In July of 1977, the City Zoning Enforcement Officer (Romero) conducted a survey of local businesses which were nonconforming adult establishments, to be used as an in-house aid for enforcing the Code amendment. The results of the survey were published in an Albuquerque newspaper on October 2, 1978. The next day, Lou Avolio, manager for Commonwealth Theatres, called Romero to tell him that the 66 did not show "pornographic" movies and that it should not have been listed as an adult theatre. Avolio asked Romero to remove the 66 from the list and print a retraction in the newspaper. Romero informed Avolio that removal of the 66 from the list would jeopardize its nonconforming use status as an adult theatre. Avolio stated that he no longer intended to show adult movies at the 66. After TNT subleased the 66 in April, 1980, the 66 again fell under the Code definition of an "adult theater" because of the

type of movies shown. The City notified TNT of its violation of the Code. TNT filed a declaratory judgment action seeking a judicial declaration that the operation of the 66 was in full compliance with the Code. The City counterclaimed for a permanent injunction seeking to prohibit the operation of the 66 as an adult theatre.

### I.

It is the City's position that TNT violated the Code in two ways: (1) by operating an adult theatre within 500 feet of a residential zone, in violation of § 30(B)(10)(d)(1), and (2) by failing to amend its site development plan, in violation of § 30(A) (discussed *infra*, Point III).

TNT challenges the 500-foot distance restriction provision on the basis that it is unconstitutionally vague since the Code fails to specify the manner in which the distance is to be measured. Section 30(B)(10)(d)(1) provides:

B. Special Uses:

. . . .

10. Drive-in theater, provided:

. . . .

    d.  Any adult theater is not (1) Located within 500 feet from the nearest residential zone . . . .

In support of its vagueness argument, TNT relies on Justice Blackmun's dissenting opinion in *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). The ordinance challenged in *Young* is virtually identical to the one challenged here.[1] The dissenters found that it was vague because (1) it failed to specify how much of the described sexual activity or anatomical areas would be allowed before the movie could be characterized as having an "emphasis" on such matter and (2) it failed to specify adequate procedures or standards for obtaining a waiver of the 1,000-foot restriction. TNT's reliance on *Young*, however, is misplaced for two reasons. First, the dissenters were unable to persuade the majority that the ordinance is

vague on the above-described grounds; we are equally unpersuaded. Second, and more important, no vagueness challenge was made on the basis that the ordinance failed to describe the manner of measurement of the distance restriction. Therefore, we cannot rely on either the majority or the dissenting opinions in *Young* to dispose of the vagueness issue raised here.

■ The standard for determining whether a given statute is vague was set forth in *State v. Dority*, 55 N.M. 12, 29, 225 P.2d 1007, 1017 (1950), *appeal dismissed*, 341 U.S. 924, 71 S.Ct. 798, 95 L.Ed. 1356 (1951).

Legislative enactments may be declared void for uncertainty if their meaning is so uncertain that the court is unable, by the application of known and accepted rules of construction, to determine what the legislature intended with any reasonable degree of certainty. But absolute or mathematical certainty is not required in the framing of a statute. [Citations omitted.]

The same standard was applied to administrative regulations in *New Mexico Mun. L., Inc. v. New Mexico Envir. Imp. Bd.*, 88 N.M. 201, 539 P.2d 221 (Ct.App.), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975), and we now apply it to municipal ordinances.

■ The entire Code is to be read as a whole and each part is to be construed in relation to every other part so that a harmonious whole is reached. *Burroughs v. Board of Cty. Com'rs, Cty. of Bernalillo*, 88 N.M. 303, 540 P.2d 233 (1975). It should also be interpreted to mean what the legislative body enacting it intended it to mean, and to accomplish the ends sought to be accomplished by it. *Id.; State ex rel. Sanchez v. Reese*, 79 N.M. 624, 447 P.2d 504 (1968).

Since the ordinance does not set forth the manner in which the distance is to be measured, we must look at the method employed by the City Zoning Enforcement Officer to determine its reasonableness and whether it has been consistently used. *See generally*

---

1. The ordinance prohibited the location of an adult theatre within 1,000 feet of any two other "regulated uses" or within 500 feet of a residential area.

*Nye v. Board of Com'rs of Eddy County,* 36 N.M. 169, 9 P.2d 1023 (1932). Romero testified that he always measures from lot line to lot line. Using this method of measurement, the 66 lot line is within 500 feet from the nearest residential lot line. TNT presented a surveyor who testified that the 66 is outside the 500-foot restriction if the measurement is taken from either the concrete base of the screen or from any point within the walled area of the premises.

■ Looking at the ordinance as a whole, it is clear that one of the intended purposes is to regulate the use of adult entertainment facilities which are close to residential areas. The provision is in keeping with the stated purpose of promoting the general welfare of the citizens of Albuquerque. § 2(A). Several provisions of the Code speak in terms of "premises" or "area," indicating that the regulation applies to more than just the structure. The premises on which the 66 is located is zoned SU–1. A "special use zone" allows certain uses which are special because of their infrequent occurrence or their effect on the surrounding property. § 30. In order to obtain a special use permit, an applicant must submit to the City's Environmental Planning Commission a site development plan and a preliminary landscaping plan, "each of which shall cover the *entire* SU–1 area." § 30(A)(1)(a) (emphasis added). Approval of the site development plan is made for the entire lot and not only for the structures on the lot. Clearly this makes sense, since some structures, such as fences, could be moved in order to expand a special use, if the special use ran with the structure rather than with the given lot. Although the Code speaks in terms of an adult "theater" not operating within 500 feet of a residential "zone," it cannot be said that the area outside of the 66 fence is not a part of the same theatre. Surely the sign located outside the fenced area which advertises to the public the operation of the 66 is also a part of the theatre.

The trial court found that the method of measurement employed by Romero was reasonable and was applied even-handedly and consistently in every case. The court also found that the City had delegated, by ordinance, to the Zoning Enforcement Officer the duty to enforce the ordinance, which includes the manner of measuring the distance restrictions. § 46(A)(1). We will not disturb these findings, especially since deference is given to the interpretation of the ordinance by those administering the ordinance. *City of Syracuse v. Hueber,* 52 App. Div.2d 341, 383 N.Y.S.2d 774 (1976); *see Norvell v. Sangre de Cristo Development Co., Inc.,* 519 F.2d 370 (10th Cir. 1975); *Ortega v. Otero,* 48 N.M. 588, 154 P.2d 252 (1944).

■ We also do not find that the failure of the ordinance to specify the manner of measurement violates Section 3–21–6, N.M. S.A. 1978 (Cum.Supp.1981) which states:

A. The zoning authority within its jurisdiction shall provide by ordinance for the manner in which zoning regulations, restrictions and the boundaries of districts are:

(1) determined, established and enforced . . . .

A careful reading of the Code indicates that the manner of measurement is ascertainable and susceptible of a reasonable interpretation by the Zoning Enforcement Officer to whom such interpretation and enforcement has been delegated. "Standards required to support a delegation of power by the local legislative body need not be specific," *City of Santa Fe v. Gamble-Skogmo, Inc.,* 73 N.M. 410, 417, 389 P.2d 13, 18 (1964), as long as they are capable of reasonable application and are sufficient to limit and define discretionary powers. *Id.* We do not find that measurement from lot line to lot line, as Romero did here, is unreasonable, and since the Code speaks in terms of "premises" and "areas," it is sufficient to limit Romero's discretion to measuring from lot line to lot line.

For the foregoing reasons, we cannot say that the Code provision prohibiting the operation of an adult theatre within 500 feet of a residential zone is so uncertain that we are unable, by use of accepted rules of construction, to determine the intent of the

City Council. Nor is it so vague that "men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

## II.

TNT next argues that, even if their operation as an adult theatre was nonconforming because the 66 is located within 500 feet of a residential zone, Commonwealth did not abandon this use for the required one-year period of the Code and thus TNT could continue showing adult movies.

█ TNT challenges the court's conclusion that the 66 abandoned its pre-existing nonconforming use. Inasmuch as TNT is challenging a legal conclusion, the standard for review is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party. This means that we indulge all reasonable inferences in support of the court's decision, and disregard all inferences or evidence to the contrary. *Ross v. Ringsby*, 94 N.M. 614, 614 P.2d 26 (Ct.App.1980).

█ TNT cites 82 AM.JUR.2d *Zoning and Planning* § 216 (1976) for the elements of abandonment in this context. As stated there, the elements are: (1) "an intention on the part of the owner of such [special] use to permanently relinquish the nonconforming use" and (2) "some overt act, or some failure to act, which indicates the abandonment." *Id.* at 738 (footnote omitted). TNT asserts that there was no evidence that it *intended* to abandon its special use status. Proof of intent, however, is unnecessary in this case. In the same sentence cited by TNT from AM.JUR.2d, reference is made to Section 220 which is dispositive of the intent issue. Section 220 states that, where an ordinance "contains a discontinuance-time limitation provision stating in effect that if a factual discontinuance or vacancy continues for a specified period of time, the right to resume the nonconforming use automatically terminates." *Id.* § 220, at 742. *Accord, C. F. Lytle Co. v. Clark*, 491 F.2d 834, 837 (10th Cir. 1974). Section 40(D)(1)(i) provides such a discontinuance-time limitation period:

A structure non-conforming *as to use* which hereafter becomes vacant and remains unoccupied *or is not used for a continuous period of one year* or more is not to be occupied thereafter except by a conforming use. [Emphasis added.]

TNT first argues that there is no evidence that the 66 ever became vacant or unoccupied or unused for a continuous period of one year or more. This argument is without merit. Although the 66 continued to operate as a "drive-in" theatre, it did not continue as an "adult" theatre, as discussed *infra*. Since it is the *use* of the premises within the 500-foot restriction that gives it a nonconforming status, such status is abandoned when it "is not *used* for a continuous period of one year or more." § 40(D)(1)(i) (emphasis added).

Second, TNT argues that since the 66 continued to show the same type of movies before and after Avolio's phone call, the nonconforming use never changed. While the manager of the 66 testified that the theatre continued, subsequent to Avolio's phone call, to show movies depicting nude males and females, he testified that the nudity was only *incidental* to the movie, rather than the *emphasis* of the movie. There is ample evidence indicating that the 66 did not show "adult" movies from 1978 until 1980 when TNT subleased the theatre. Therefore, the special use was discontinued beyond the one-year period of the ordinance, rendering proof of intent to abandon unnecessary. "[T]he effect of an ordinance concerning abandonment . . . is to automatically foreclose any inquiry as to the owner's intent to abandon if the specified period of time is reasonable on its face (as 10 months is)." *Sun Oil Co. of Pa. v. Board of Zoning Appeals*, 57 App.Div.2d 627, 393 N.Y.S.2d 760, 762 (1977), *aff'd*, 44 N.Y.2d 995, 380 N.E.2d 328, 408 N.Y.S.2d 502 (1978). While we recognize that mere temporary suspension of use resulting from causes beyond the owner's control does not constitute an abandonment or discontinuance within the meaning of the Code, *City*

*of Las Cruces v. Neff*, 65 N.M. 414, 338 P.2d 731 (1959), we do not have such a case here.

The same evidence of discontinuance also satisfies the element of an overt act, or failure to act, indicating abandonment.

### III.

 The final issue is whether there is substantial evidence to support the court's finding that the 66 changed its use from a drive-in theatre to an adult theatre in 1980 when TNT subleased the 66 and began showing adult movies. After a thorough review of the entire record we find that there is substantial evidence to support the court's finding of a change in use.

"Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and if there is such evidence in the record to support a finding, it will not be disturbed. [Citation omitted.] Moreover, in examining such evidence an appellate court will view the evidence in a light most favorable to the prevailing party below and will not disturb findings, weigh evidence, resolve conflicts, or substitute its judgment as to the credibility of witnesses where evidence substantially supports the findings of the trial court. [Citation omitted.]

*Den-Gar Enterprises v. Romero*, 94 N.M. 425, 429, 611 P.2d 1119, 1123 (Ct.App.), *cert. denied*, 94 N.M. 628, 614 P.2d 545 (1980). Once the 66 abandoned its nonconforming use as an adult theatre in 1978, it retained its special use status as a drive-in theatre, since this use was not abandoned. When TNT subleased the 66 in 1980 and began showing adult movies, an amendment to the site development plan was necessary. *See* § 30(A). Since TNT failed to submit an amended site development plan to the City for approval,[2] the trial court properly granted the permanent injunction. We

therefore affirm the decision of the district court.

IT IS SO ORDERED.

PAYNE and FEDERICI, JJ., concur.

EASLEY, C. J., respectfully dissenting.

RIORDAN, J., not participating.

2. After the issuance of a preliminary injunction prohibiting the operation of the 66 as an adult theatre and before trial on the merits, TNT filed an appeal of the Zoning Enforcement Officer's decision that it was not in compliance with the Code. The appeal was heard by the Albuquerque Environmental Planning Commission and was denied. The denial was upheld by the City Council. TNT then filed, under protest, an amended site development plan with the Planning Commission, which denied it. The City Council also upheld this decision. TNT does not appeal the City Council's decision.