2004-NMCA-084

94 P.3d 822

**Lawrence S. ALBA, Appellant–Respondent,**

v.

**PEOPLES ENERGY RESOURCES CORPORATION, Intervenor–Petitioner,**

**and**

**Valencia County Board Of County Commissioners, Appellee–Interested Party.**

No. 23,963.

Court of Appeals of New Mexico.

May 13, 2004.

Certiorari Denied, No. 28,718, July 8, 2004.

Hessel E. Yntema, III, Oman Yntema & Lucero P.A., Albuquerque, for Respondent.

John J. Kelly, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for Petitioner.

Thomas C. Garde, Torres and Garde, P.C., Los Luñas, for Appellee Valencia County Board of Commissioners.

Robert H. Clark, Albuquerque, for Amicus Curiae Public Service Company of New Mexico.

## OPINION

VIGIL, J.

{1} The Planning and Zoning Commission of Valencia County (Zoning Commission) approved a site development plan for a natural gas fired electric generating facility (Facility) submitted by Peoples Energy Resources Corporation (Peoples). Lawrence Alba (Alba) unsuccessfully appealed the Zoning Commission decision to the Valencia County Board of Commissioners (County Commission), which also approved the plan. Alba then appealed to the district court, which reversed the decision of the County Commission. *See* NMSA 1978, § 3-21-9 (1999) (providing person aggrieved by decision of zoning authority with statutory right of appeal); NMSA 1978, § 39-3-1.1(C) (1999)

(providing for appeal to district court from final decision of administrative agency); Rule 1–074 NMRA 2004 (stating procedure to appeal final administrative decision to district court where there is a statutory right to do so).

{2}  We granted Peoples' petition for a writ of certiorari to review the decision of the district court.  *See* § 39–3–1.1(E) (providing that party to appeal of final administrative decision in district court may seek review of district court decision by filing for writ of certiorari in Court of Appeals which may exercise its discretion whether to grant review); Rule 12–505 NMRA 2004 (stating procedure to seek certiorari in Court of Appeals from decision of district court in administrative appeals).  We reverse the district court and reinstate the County Commission's decision approving the site development plan for the Facility.

**BACKGROUND**

{3}  The Facility Peoples seeks to develop is a natural gas fired electric generating plant which will typically operate during times of peak electrical demand and emergencies.  Peoples wishes to locate the Facility in the Rio Grande Industrial Park near Belen, New Mexico.  Peoples chose that particular location because of the history behind a previously rejected application to develop an electric generating station made by Cobisa Rio Puerco Limited Partnership (Cobisa).  Cobisa had proposed to build its facility on vacant land that was zoned as "Outland District," and sought to amend the official zoning map to change the designation of its proposed site to "Heavy Industrial District, I–3" (I–3).  Cobisa's application was rejected by the County Commission because it had not been demonstrated that the proposed use of the land was the most appropriate use, "given the fact that Valencia County has approximately 2300 acres of vacant industrial lands already deemed appropriate for industrial uses."

{4}  Peoples therefore searched for a site on property already zoned I–3, and settled on a parcel of land located in the Rio Grande Industrial Park. Other businesses located in the Rio Grande Industrial Park included Mesa Environmental (a company that recy-cles used oil), Avonite (a company that uses acrylic or polyester resins and mineral fillers to manufacture such products as countertops), Solo Cup, Chem Lime, Hydro Cut, and United Desiccants.

{5}  After tentatively selecting the site, Peoples wrote to Steven Chavez, the Valencia County Planner, in July 2001, seeking confirmation that the Rio Grande Industrial site was appropriately zoned for the proposed Facility.  Steven Chavez was also the "main architect" of Valencia County's Comprehensive Zoning Ordinance, §§ 100–1307.3 (Nov. 8, 1999).  Steven Chavez responded that the entire Rio Grande Industrial Park is zoned I–3, and an electric generation plant is a permissive use in an I–3 zone.  Steven Chavez wrote that, "[a] facility which processes natural gas for the production of electricity qualifies under [Section 703.02.E] of the I–3 zone district as a permitted use."  After receiving this response, Peoples purchased an option to acquire the site, and began the application process.

{6}  In April 2002, Peoples held a pre-application conference, as required, with Valencia County Zoning Supervisor Ruben Chavez.  The ordinance describes different types of procedures to be used for review of applications. § 1201.01.  Under procedure type A, the County Zoning Administrator determines the adequacy and completeness of the plan described in the application. § 1201.01.A.  Under procedure type B, notice of the application must be given to surrounding landowners, and a public hearing may be held before the Zoning Commission, if requested. § 1201.01.B.  Ruben Chavez recommended that "a higher level of review than a type A process would most likely be followed" for Peoples' application.  He felt that, due to the size of the facility, a higher level of review should be followed.  Ruben Chavez also reviewed the foregoing response written by Steven Chavez and concurred with his determination that a power plant is allowed in an I–3 zone.

{7}  Peoples submitted its final application in August 2002, and a public hearing was conducted by the Zoning Commission.  The Zoning Commission heard testimony regarding the Facility and received testimony and

comments from numerous citizens, including Alba. The Zoning Commission declared that the Rio Grande Industrial Park is zoned I–3. Alba expressed frustration that the zoning of the property in the Rio Grande Industrial Park had been changed to I–3 in 1999, and stated that he never received notice of the change. However, Ruben Chavez explained that in 1999, the entire county was re-zoned and notification was properly made by publication in a newspaper of general circulation. County Attorney Garde explained that the County's position was that the property in question was zoned I–3. At the conclusion of the hearing, the Zoning Commission approved People's site development application.

{8} Alba appealed the decision of the Zoning Commission to the County Commission. Alba argued, among other things, that an electric power plant is not a permissive or conditional use in an I–3 zone. The County Commission held a public hearing on the appeal on September 17, 2002, and designated it a de novo hearing. The County Commission heard argument from the parties as well as the public. After further discussion, the County Commission denied Alba's appeal.

{9} Alba appealed the County Commission's decision to the district court. Alba again argued that an electric power plant is not a permitted use in an I–3 district, and that there was not substantial evidence to support a determination that the property in question is zoned I–3. He also argued that the County Commission was arbitrary and capricious when it refused to obtain and consider what he represented to be "a certified copy" of a map showing the zoning of the property was not I–3. Following oral argument, the district court filed its order reversing the decision of the Valencia County Commission. The order states:

> [T]he decision of the Valencia County Commission that the proposed Valencia Energy Facility is a "permitted use" in the I–3 zone is reversed, the Court finding that such facility falls outside the meaning of permitted use, applying the ordinary and common sense meaning of the County's zoning ordinance; and that further, the County Commission erred in not fol-

lowing the proper procedures in determining that the underlying zoning on the subject property is I–3 and should give the Appellant and any other member of the public an opportunity to present any evidence concerning whether or not this industrial park is zoned I–2 or I–3.

{10} Peoples filed a petition for writ of certiorari from that decision, and we granted the petition.

## DISCUSSION

### Appealable Order

{11} Alba contends that, because the district court order suggests further proceedings to be held by the County Commission on remand, it is not appealable, and therefore not subject to review by this Court. Alba relies on *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 33–36, 888 P.2d 475, 479–82 (Ct.App.1994), in which we held that a district court order remanding a matter to an agency for further consideration is not a final, appealable order. In making his argument, however, Alba, has overlooked the context in which the district court ordered the remand. As we recognized in *High Ridge Hinkle Joint Venture, id.* at 36, 88 P.2d at 482, the issues surrounding finality are sometimes subtle. When we review the context of the remand portion of the district court's order, we can readily see that the district court's order in this case was in fact final and the remand portion of it incidental.

{12} As explained above, the district court ruled that the proposed Facility is not a permitted use in an I–3 zone and reversed the County Commission's contrary ruling. The district court also ruled that proper procedures were not followed in determining the actual zoning classification of the property at issue, and its order allowed Alba and other members of the public to present further evidence on this issue. As will become clear later, there is no issue but that the zoning classification of the property at issue is heavy industrial, or I–3 on the official map.

{13} As we stated in *High Ridge Hinkle Joint Venture*, "the term 'finality' is to be given a practical, rather than a technical, construction." *Id.* at 34, 888 P.2d at 480

(internal quotation marks and citation omitted). Even Alba's tendered map, showing that the classification is I–2, labels I–2 as heavy industrial. The district court ruled that the proposed facility is not a permitted use in a heavy-industrial zone and that the County would have to amend its zoning ordinance to specifically allow electric power plants in heavy-industrial zones. The practical effect of this ruling was as final as one can imagine, regardless of whether the zoning classification is I–2 (heavy industrial) or I–3 (heavy industrial).

**Interpretation of the Ordinance**

■ {14} The parties agree that this case involves the interpretation of an ordinance, a question of law, which we review de novo. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998–NMSC–050, ¶ 4, 126 N.M. 413, 970 P.2d 599; *see Downtown Neighborhoods Ass'n v. City of Albuquerque*, 109 N.M. 186, 189, 783 P.2d 962, 965 (Ct.App.1989). We agree with this proposition, and thus, we need not concern ourselves with the parties' dispute about the general standard governing our review of district court decisions on administrative appeals.

■ {15} The County of Valencia adopted a Comprehensive Zoning Ordinance, §§ 100–1307.03. Section 703.02 describes permitted uses for property zoned for Heavy Industrial District (I–3). "The purpose of the I–3 District is to provide for industrial uses with high-nuisance characteristics that are incompatible with adjacent urban residential uses or for industrial uses where space or performance characteristics demand a specialized locale." § 703.01. Specifically permitted uses in the I–3 district are:

A. Grain elevators, feed mills and seed cleaning plants;

B. Manufacture of forest products, including sawmills, planing mills, plywood and particle board plants and pulp and paper mills;

C. Auto wrecking yards;

D. Animal slaughtering, meat-packing and rendering plants;

E. *Facilities for the processing or production of oil, natural gas, geothermal resources or other hydrocarbons;*

F. Manufacture of clay products, brick, tile and cement and including mining of materials used in production;

G. Outdoor storage of raw materials or finished products associated with any permitted use;

H. Temporary structures as may be required during construction of an authorized permanent structure. Such temporary structure shall be removed upon final inspection of the permanent structure by the Building Inspector;

I. Community or municipal water supply system;

J. Community or municipal sewer system; and

K. Signs, pursuant to the sign provisions set forth in Section 1006.

L. Dwelling for caretaker or watchman in conjunction with permitted use. If a dwelling is a mobile home it shall, in addition to the requirements of this section, also be subject to the mobile home standards set forth in Section 909.

§ 703.2 (Emphasis added and other emphasis omitted). Section 703.02.E use is the one pertinent to this appeal.

{16} The ordinance also provides that any use "not specifically listed as a permitted use" that is "similar in character, scale and performance to the permitted uses specified" may be allowed "as a similar use subject to the Type A application procedure." § 703.04.

{17} To construe the ordinance, we follow the principles and employ the analysis described in *High Ridge Hinkle*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599:

The first rule is that the plain language of a statute is the primary indicator of legislative intent. Courts are to give the words used in the statute their ordinary meaning unless the legislature indicates a different intent. The court will not read into a statute or ordinance language which is not there, particularly if it makes sense as written. The second rule is to give

persuasive weight to long-standing administrative constructions of statutes by the agency charged with administering them. The third rule dictates that where several sections of a statute are involved, they must be read together so that all parts are given effect. This includes amendments. *Id.* (internal quotation marks and citations omitted).

{18} The "plain language" rule of statutory construction is the primary indicator of legislative intent, and in applying that rule, we give the words in the ordinance their ordinary meaning. *Id.* In addition, the ordinance itself provides that any word or term not defined "shall be used with a meaning of common standard use[,]" and any words "shall be construed according to their common, ordinary and accepted meaning." § 201.f. We are not persuaded by Alba's argument that we must look to other, non-zoning related statutes for the definition of "natural gas processing."

{19} The ordinance includes, as a permitted use, "[f]acilities for the processing or production of oil, natural gas, geothermal resources or other hydrocarbons." § 703.02.E. The operation of the Facility would, in general, be to mix compressed air with natural gas, and ignite the mixture to run turbines that generate electricity. The question here is whether such "processing" of natural gas in order to produce electricity falls within the language of the permitted use. "Process" is defined in part to mean "to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result." Webster's Third New International Dictionary (unabridged) 1808 (2002). Here, the natural gas is to be subjected to a system or treatment designed to produce electricity. Therefore, the Facility is to be used for the "processing" of natural gas within the literal language of the ordinance.

{20} Secondly, "persuasive weight" is given to long-standing construction of an ordinance by an agency. *High Ridge Hinkle,* 1998–NMSC–050, ¶ 7, 126 N.M. 413, 970 P.2d 599. The ordinance in this case was adopted in November 1999. The Cobisa application was rejected in April 2001, Steven Chavez

issued his recommendations in July 2001, and the public hearing before the Zoning Commission was held in September 2002.

{21} Alba argues that the Zoning Commission's construction of the ordinance should not be considered long standing. In support of this argument, Alba cites to *High Ridge Hinkle* and *TBCH, Inc. v. City of Albuquerque,* 117 N.M. 569, 572, 874 P.2d 30, 33 (Ct.App.1994). We disagree with Alba's interpretation of those decisions. In *High Ridge Hinkle,* the Supreme Court found that no persuasive weight should be given to the agency's construction of the applicable ordinance because, for over sixteen years, the agency was not even aware of the construction being given to the ordinance. *High Ridge Hinkle,* 1998–NMSC–050, ¶ 7, 126 N.M. 413, 970 P.2d 599. In fact, the agency had "never construed [the] ordinance until [the] case was filed." *Id.* This Court in *TBCH, Inc.,* noted that the construction given the ordinance in that case was not long standing where the ordinance had been enacted, superseded, and re-implemented over a period of six years. *TBCH, Inc.,* 117 N.M. at 572, 874 P.2d at 33. Finally, in both cases, interpretation of the ordinance was resolved based on the plain language rule of construction. Neither decision dictated that a particular period of time must pass in order for a long-standing interpretation to exist.

■ {22} There are numerous decisions, in zoning and other areas of law, that do not include a long-standing requirement, but still allow a reviewing court to give some deference to an agency's interpretation of its own ordinance. *See, e.g., Lantz v. Santa Fe Extraterritorial Zoning Auth.,* 2004–NMCA–090, ¶ 10, 136 N.M. 74, 94 P.3d 817 [Nos. 23, 138 and 23, 143, 2004 WL 1699003 (N.M.Ct. App. May 13, 2004) ]; *City of Albuquerque v. N.M. Pub. Regulation Comm'n,* 2003–NMSC–028, ¶ 16, 134 N.M. 472, 79 P.3d 297; *In re Adjustments to Franchise Fees Required By the Elec. Util. Indus. Restructuring Act of 1999,* 2000–NMSC–035, ¶ 10, 129 N.M. 787, 14 P.3d 525; *Regents of Univ. of N.M. v. N.M. Fed'n of Teachers,* 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236; *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n,* 120 N.M. 579, 583,

904 P.2d 28, 32 (1995); *Tex. Nat'l Theatres, Inc. v. City of Albuquerque*, 97 N.M. 282, 286, 639 P.2d 569, 573 (1982). An appellate court will, in fact, confer a heightened degree of deference when the interpretation of an ordinance involves "special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *See, e.g., In re Adjustments to Franchise Fees*, 2000–NMSC–035, ¶ 10, 129 N.M. 787, 14 P.3d 525 (internal quotation marks and citation omitted).

{23} In this case, there are several indications that the county had interpreted the ordinance to allow the Facility as a permitted use for property zoned I–3. For example, the Cobisa application was for a similar facility and was rejected primarily because Cobisa sought to re-zone other property as I–3 when the county already had vacant I–3 property, and not because of the type of facility Cobisa wished to construct. Steven Chavez, the "main architect" of the ordinance and the County Planner, wrote that a facility processing natural gas for generation of electricity is a permissive use in the Rio Grande Industrial Park which is zoned I–3. Ruben Chavez, the County Zoning Supervisor, reviewed Steven Chavez's determination and agreed that an electric power plant is appropriate for property zoned I–3. In addition, the Zoning Commission and the County Commission, after hearing testimony on the subject, determined that the Facility was a permitted use under the ordinance. As discussed, our case law allows this Court to give deference to this determination, and we see no reason to refrain from doing so. We do not find the interpretation of the ordinance to be unreasonable or unlawful. *See Morningstar Water Users Ass'n*, 120 N.M. at 583, 904 P.2d at 32.

{24} Finally, we are further persuaded that the ordinance has been correctly interpreted when we read various sections of the ordinance together. As noted above, the purpose of the heavy industrial or I–3 zoning area is "to provide for industrial uses with high-nuisance characteristics" or "for industrial uses where space or performance characteristics demand a specialized locale." § 703.01. In addition to the processing of

natural gas, the permitted uses include mining of materials to produce clay, brick, tile, and cement products; manufacturing of forest products including the making of paper in mills; and processing or producing geothermal resources or other hydrocarbons. § 703.02.

{25} The processing of geothermal resources is of particular interest in our analysis. Geothermal energy is understood to mean "the natural heat of the earth which can be extracted in the form of hot water and/or water vapor." *See R & R Energies v. Mother Earth Indus., Inc.*, 936 P.2d 1068, 1073 (Utah 1997) (internal quotation marks and citation omitted). Geothermal energy consists of heat and pressure used to produce energy, and "must be exploited, if it is to be exploited at all, on the lands from which it is to be removed" because both heat and pressure are lost if steam is allowed to escape or is transported long distances. *See Rosette Inc. v. United States*, 277 F.3d 1222, 1233 (10th Cir.2002). Thus, geothermal resources can be used, or processed, to create other forms of energy such as electricity, just as the gas would be used in this case to generate electricity. Since it appears that a plant for processing geothermal resources into electrical energy would be included in the permitted uses, it is reasonable to conclude that a plant that uses natural gas for the same purpose would also be included as a permitted use.

{26} Furthermore, despite the fact that an electric power plant is not specifically listed as a permitted use, the ordinance includes a provision allowing uses that are "similar in character, scale and performance to the permitted uses specified." § 702.4. It is significant that the ordinance seems to cover an oil refinery, which is clearly a plant for processing oil or other hydrocarbons. *See* § 703.02.E. Given the nature of the permitted uses listed in the ordinance, which operate on a large scale and use large areas of property, we conclude that an electric power plant would be considered a similar use and would be included as a permitted use under the ordinance.

{27} Finally, we are not persuaded by Alba's argument that the presence of utility

facilities as conditional uses in the less-restrictive zoning classifications of mineral resource, neighborhood commercial, community commercial, resource industrial (I–1), and light industrial (I–2) means that facilities such as the Facility at issue here are not allowed at all in the heavy-industrial (I–3) district. To the contrary, we think it more likely that facilities such as the Facility at issue here are specifically contemplated as permitted uses in the heavy-industrial district and that is why they are not listed as conditional uses.

**Procedure in County Commission Hearing**

{28} During the hearing before the County Commission, Alba's counsel argued that the property in question was actually zoned I–2, rather than I–3. Counsel stated that he had what purported to be "a certified copy" of a map showing the zoning in the area. Peoples argued that it was surprised by the argument and had not been provided with the copy of the map. Alba responded that the map had just been discovered the previous week and had been sent to the press. Alba told the County Commission that he had "a portion of the map," but that he would like someone to get the official map from the clerk's office. It is not clear whether the County Commission viewed the map portion offered by Alba, but the Commission refused to place the map in the record stating it was not timely produced.

{29} During the pendency of this appeal, Alba filed a motion to supplement the record with a map, which is black and white and which contains only two industrial zones (I–1 (resource industrial) and I–2 (heavy industrial)), contrary to the applicable zoning ordinance, which contains three industrial zones (I–1 (resource industrial, § 701), I–2 (light/general industrial, § 702), and I–3 (heavy industrial, § 703)). Because this map does not appear to be the official map, it does not appear consistent with the applicable zoning ordinance, it is not certain that it was what was presented in the earlier proceedings, and it does not assist Alba's cause, we deny the motion to supplement.

{30} The record before us without inclusion of the map contains sufficient evidence to support the finding that the property was zoned I–3. For example, in response to Alba's proffer of the map, Ruben Chavez testified that the official zoning map was in his office and the office of the clerk, that the County Commission "signed that map from time to time" as changes were made, and that there was concurrence that the property was zoned I–3. Ruben Chavez testified that the property "was zoned I–3 back in 1999 when this Commission adopted the zoning map." William Giron, an owner of property within the Rio Grande Industrial Park, testified that the property was bought as a Type 3. This is sufficient evidence to support the determination that the property was zoned I–3. In addition, in a memorandum opinion in a related case involving the same property, we noted that Alba admitted that the "map on which he relies states that the pertinent zoning is heavy industrial." *Alba v. Valencia County Bd. of County Comm'rs*, No. 23,863, slip op. at 2 (N.M. Ct.App. June 10, 2003) (unpublished opinion). *See State v. Anaya*, 1997–NMSC–010, ¶ 13, 123 N.M. 14, 933 P.2d 223 (providing that appellate court may take judicial notice of court records).

{31} Alba argues that the County Commission erred in refusing to place the proffered map into the record, and the matter should be remanded to allow another hearing at which the map can be considered. Alba claims that, by refusing to include the map, the County Commission failed to follow the process required under the ordinance. Review by the County Commission under Section 1303.03 of the ordinance is "confined to the record of the proceedings," which includes all materials "received or considered by the Administrator or the Planning Commission as evidence." § 1303.03.A. The procedures under the ordinance for de novo hearings provide that the board may, "at its option, . . . hold a de novo hearing or admit additional testimony and other evidence with or without holding a de novo hearing, if it is satisfied that the testimony or other evidence could not have been presented upon initial hearing and action." § 1303.04. In deciding whether to admit the testimony or evidence, the board is required to consider the following: prejudice to the parties; surprise to the

opposing party; convenience of locating the evidence at the time of the initial hearing; when notice was given regarding an attempt to admit the evidence; and the competency, relevancy, and materiality of the evidence. § 1303.04.

{32} Peoples claimed that it was surprised by the introduction of the map, and presented testimony from Ruben Chavez to contradict Alba's argument that the area was zoned I–2 rather than I–3. Also, the map offered by Alba was not the official zoning map, but was purportedly a black-and-white copy of the official map, which Alba's attorney "believe[d]" had been colored by someone in the clerk's office. The ordinance specifically provides that, regardless of "purported copies of the Official Zoning Map," there is only one official map and it is the "final authority as to the current zoning status of any land." § 302.05. It was not error for the County Commission to refuse to admit the map into evidence.

## CONCLUSION

{33} We hold that the proper procedures were followed in reviewing Peoples' application, and it was not error for the County Commission to refuse to admit the copy of the map offered by Alba. We also hold that the County Commission was correct in finding that the Facility which Peoples seeks to construct falls within the permitted uses under the ordinance for I–3 property. We reverse the decision of the district court and reinstate the County Commission decision approving the site development plan for the Facility.

{34}  **IT IS SO ORDERED.**

PICKARD and CASTILLO, JJ., concur.