IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-045

Filing Date:  March 23, 2009

Docket No. 27,907

SAN PEDRO NEIGHBORHOOD ASSOCIATION,

  Appellant-Respondent,

v.

BOARD OF COUNTY COMMISSIONERS
OF SANTA FE COUNTY,

  Appellee-Petitioner,

and

PAUL PARKER,

  Interested Party-Petitioner.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
James A. Hall, District Judge

The Graeser Law Firm, L.L.C.
Christopher L. Graeser
Santa Fe, NM

for Respondent

Stephen C. Ross, County Attorney
Sue A. Herrmann, Assistant County Attorney
Santa Fe, NM

for Petitioner Board of County Commissioners

The Bregman Law Firm, P.C.
Sam Bregman
Eric Loman
Albuquerque, NM

1

for Petitioner Parker

**OPINION**

**VIGIL, Judge.**

**{1}** Paul Parker (Applicant) operates a sand and gravel mine on five acres of land he leases from the United States that is managed by the Bureau of Land Management (BLM). He also owns fifteen acres of land adjacent to the mine lease, and both properties are located within the San Pedro Contemporary Community Zoning District (San Pedro District) in Santa Fe County. The question presented in this case is whether sand and gravel mined from the federal BLM land may be stockpiled on the adjacent subject property. The issue arises because a Santa Fe County ordinance prohibits both "mining" and "commercial districts" within the San Pedro District. The Santa Fe Board of County Commissioners (Board) determined that stockpiling on the subject property is allowed, and the San Pedro Neighborhood Association (Association) appealed to the district court. The district court concluded that the Board decision is not in accordance with law or supported by substantial evidence, and reversed. We affirm.

**BACKGROUND**

**{2}** In 2001, the San Pedro District was established in Santa Fe County with the passage of Santa Fe County Ordinance No. 2002-2 (the Ordinance). Section 5.6.1 of the Ordinance directs: "No mining of any type shall be allowed, including but not limited to gravel mining and other types of mining." In addition, Section 5.7.1 of the Ordinance states, "No commercial districts shall be allowed in the Planning Area. All commercial uses must meet the requirements for home occupations and home businesses as stated in Section 5.9 of this Ordinance."

**{3}** In 2003, Applicant acquired the BLM mining lease on five acres of land owned by the United States. Applicant also owns fifteen acres of land immediately adjacent to the BLM mining lease, and both properties are located within the San Pedro District. In May 2003, the County issued to Applicant a notice of violation for unpermitted development, namely, operating a sand and gravel company and stockpiling material off-site without a permit. In response, Applicant applied to the County for permission to stockpile on the fifteen-acre parcel (the subject property) for four months and to locate a weigh station and guard trailer on the subject property. In January 2004, the Board approved a temporary development permit for two years which allowed the weigh station and guard trailer on the subject property with the condition that the existing stockpiled material on the subject property be removed within 120 days and that no new material be added to the stockpile.

**{4}** Before the temporary permit expired, Applicant applied for its renewal and also asked the County to remove the condition that he not stockpile mined material on the subject property. The application was first presented to the County Development Review Committee

2

(CDRC), which recommended approval of the amendment after hearing testimony for its approval on behalf of Applicant and against its approval by the Association. The CDRC was presented with evidence from Applicant that "it has proven difficult to store material within the current five acre BLM mining site." This evidence was included in the record, which was subsequently considered by the Board. Evidence was also presented on behalf of Applicant to the CDRC that "it is difficult to mine and stockpile within the same site." The Board then held a public hearing to consider the application, and members of the Association appeared and testified in opposition to the proposed amendment.

{5}    Applicant testified that the mining operation has many customers, including the State Highway Department and the County, who prefer to have a stockpile ready when they need material. Applicant stated that the amount of existing stockpile on the five acres of BLM land was between 8,000 and 12,000 tons, and that he had previously stockpiled 20,000 to 30,000 tons on the subject property. When questioned about the size of the proposed stockpile, Applicant stated that the amount would depend on the market and the demand. Applicant also testified that he was "really crowded for room" on the five acres with the other mining operations in the same space, especially if customers wanted the material stockpiled ahead of time.

{6}    Evidence was also presented on Applicant's behalf that the mine has provided material for numerous projects, including Sandia Labs, Albuquerque Airport, Kirtland Air Force Base, and assorted roadways, and that it is "very difficult" for Applicant to stockpile within the five-acre BLM mining lease. A miner and customer of Applicant added that five acres is a "very restricted" space in which to conduct the various activities involved with gravel mining, and that other mining operators have stockpiles located away from the mining sites, which makes for a "much cleaner, safer operation."

{7}    The Board approved the application in a formal order. Pertinent to this appeal, the Board made the following findings and conclusions:

    [1].    Both the mine lease and the subject property are within the San Pedro Contemporary Community Zoning District. The subject property is governed by the Santa Fe County Land        Development Code (1996, as amended) and County Ordinance No. 2002-2, the San Pedro Contemporary Community Zoning District ("the Ordinance"), enacted on April 10, 2001.

    [2].    The Ordinance prohibits "mining operations", but does not define the phrase.

    [3].    The Ordinance prohibits "commercial uses" of property within the District (except those that meet the requirements for home occupations and home businesses). The Ordinance does not define the phrase.

    [4].    The Applicant testified that he has no intention of mining outside of the

3

mine site. He also testified that his use of the subject property for stockpiling could more than triple the size of his stockpile, *thus rendering financially feasible an otherwise marginal mining operation.* (Emphasis added.)

[5]. To the extent that a county ordinance such as the San Pedro Contemporary Community Ordinance conflicts with, or frustrates the purpose of, the Federal Mining Act of 1872 ("the Mining Act"), 30 U.S.C.A. § 22 et seq., it is preempted by the Supremacy Clause of the United States Constitution. Where a Federal mining lease is granted pursuant to the Mining Act, Santa Fe County may limit the right of the lessee to mine if there are sound environmental reasons for the limitations, but only to such an extent that the limitations do not serve as an obstacle to the accomplishment of the mining lease. *California Coastal Commission et al., v. Granite Rock Co.*, 480 U.S. 572, 592, 107 S.Ct. 1419, 1425 (1987). State and local regulations which render a mine commercially impracticable cannot be enforced. *Id.* at 595, 107 S.Ct. at 1428.

[6]. The Ordinance must be construed in such a way as to avoid conflicts with the Mining Act. Therefore, the apparent prohibition on mining in the Ordinance cannot encompass stockpiling of mined materials under the circumstances described herein. Similarly, the language in the Ordinance that prohibits commercial uses does not expressly apply to the proposed stockpiling, nor should it be read to do so, for the reasons described. Moreover, stockpiling of mined materials is more properly categorized as an industrial use rather than as a commercial use.

[7]. To the extent the Ordinance does prohibit the stockpiling of mining materials on land adjacent to the mine, the [Board] finds that the prohibition would interfere with Applicant's ability to run a commercially feasible mining operation.

**WHEREFORE**, the [Board] concludes that the temporary permit to place a weigh station and guard trailer on the subject property should be re-issued for a four[-]year period of time, and the prohibition on stockpiling of mined materials on the approximately fifteen acres of the subject property behind the berm should be lifted during that four[-]year period.

{8} The Association appealed the Board decision to the district court. The district court reversed on the basis that the Board decision "to allow stockpiling of mined materials on private land adjacent to a BLM mining lease is not in accordance with law" and not supported by substantial evidence. The final order of the district court does not contain any other findings of fact or conclusions of law. However, the district court made an oral ruling, stating that the Board decision was deficient in three respects: (1) there was insufficient evidence that the Ordinance rendered Applicant's mining activity commercially unfeasible; (2) there was insufficient evidence that an industrial use was permitted on Applicant's property; and (3) there was no legal authority for a temporary permit. We do not consider the oral ruling as a final order, but simply as "instructive in determining the court's intent where an ambiguity exists in the court's decision." *In re Adoption of J.J.B.*, 117 N.M. 31, 37, 868 P.2d

1256, 1262 (Ct. App. 1993).

**{9}** Both Applicant and the Board petitioned this Court for writ of certiorari. *See* NMSA 1978, § 39-3-1.1(E) (1999) (providing that a party to an appeal of a final administrative decision in the district court may seek review of the district court decision by filing for a writ of certiorari in the Court of Appeals which may exercise its discretion whether to grant review); Rule 12-505 NMRA (stating the procedure to seek certiorari in the Court of Appeals from a decision of the district court in administrative appeals); *Alba v. Peoples Energy Res. Corp.*, 2004-NMCA-084, ¶ 2, 136 N.M. 79, 94 P.3d 822. The petitions were granted and the appeals were consolidated.

**DISCUSSION**

**{10}** In reviewing the decision of an administrative agency, the district court may set aside, reverse, or remand if it finds that the agency's action was fraudulent, arbitrary, or capricious; not supported by substantial evidence; or not in accordance with law. *See* § 39-3-1.1(D) (providing that in a proceeding for judicial review of a final decision by an agency, the district court may set aside, reverse or remand the final decision if it determines that: "(1) the agency acted fraudulently, arbitrarily or capriciously; (2) the final decision was not supported by substantial evidence; or (3) the agency did not act in accordance with law"); Rule 1-074(Q) NMRA (stating that the district court may reverse the decision of the agency if: "(1) the agency acted fraudulently, arbitrarily or capriciously; (2) based upon the whole record on appeal, the decision of the agency is not supported by substantial evidence; (3) the action of the agency was outside the scope of authority of the agency; or (4) the action of the agency was otherwise not in accordance with law").

**{11}** Upon a grant of a petition for writ of certiorari, the Court of Appeals utilizes the same standard of review to review the decision of the district court. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶¶ 16-17, 133 N.M. 97, 61 P.3d 806 ("[W]e will conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal."). We therefore review whether the Board acted fraudulently, arbitrarily, or capriciously; whether, based upon the whole record on appeal, the order of the Board is supported by substantial evidence; whether the Board acted outside the scope of its authority; and whether the action of the Board was otherwise not in accordance with law. In our review of the evidence, we review the whole record, viewing both the favorable and unfavorable evidence in the light most favorable to the administrative decision. *See Romero v. Bd. of County Comm'rs*, 2007-NMCA-004, ¶ 12, 140 N.M. 848, 149 P.3d 945, *cert. quashed*, 2007-NMCERT-009, 142 N.M. 716, 169 P.3d 409. We do not substitute our judgment for that of the agency, and "we only evaluate whether the record supports the result reached, not whether a different result could have been reached." *Id.* (internal quotation marks and citation omitted). Stated another way, we review the entire record to determine if the agency decision is supported by substantial evidence. *Paule v. Santa Fe County Bd. of County Comm'rs*, 2005-NMSC-021, ¶ 32, 138 N.M. 82, 117 P.3d 240. "Substantial evidence means

5

relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

**{12}** On the other hand, the interpretation of a zoning ordinance is a question of law that we review de novo, using the same rules of construction that apply to statutes. *Smith v. Bd. of County Comm'rs*, 2005-NMSC-012, ¶ 18, 137 N.M. 280, 110 P.3d 496; *Alba*, 2004-NMCA-084, ¶ 14. *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599, teaches that in our de novo review we are to follow three rules of statutory construction:

> The first rule is that the plain language of a statute is the primary indicator of legislative intent. Courts are to give the words used in the statute their ordinary meaning unless the legislature indicates a different intent. The court will not read into a statute or ordinance language which is not there, particularly if it makes sense as written. The second rule is to give persuasive weight to long-standing administrative constructions of statutes by the agency charged with administering them. The third rule dictates that where several sections of a statute are involved, they must be read together so that all parts are given effect.

*Id.* (internal quotation marks and citations omitted).

**(A) "Mining"**

**{13}** We first determine whether the prohibition on mining operates to prohibit stockpiling of mined material. Section 5.6.1 of the Ordinance directs: "No mining of any type shall be allowed, including but not limited to gravel mining and other types of mining." The term "mining" is not defined in the Ordinance. Therefore we will follow the guidance of *Hinkle* in our interpretation of the Ordinance.

**{14}** The first *Hinkle* rule requires us to examine the plain language of the Ordinance and give the word its ordinary meaning. In this case, the parties agree on the plain meaning of the word. The parties agree that "mining" is "the process or business of extracting ore or minerals from the ground." We accept the parties' agreement that this is the common meaning of the word. *See Webster's Third New Int'l Dictionary* 1438 (unabridged) (2002) (defining mining as "the process or business of making or of working mines").

**{15}** It is undisputed that Applicant is not extracting ore or minerals from the subject property. We therefore agree with Applicant that simply keeping a pile of rock and gravel upon the earth does not constitute "mining" as it is commonly defined. While we can agree that stockpiling is an activity *associated* with mining, the Ordinance does not prohibit all activities associated with mining. It simply prohibits "mining of any type."

**{16}** We conclude that the Ordinance prohibition on mining does not include a prohibition on stockpiling.

6

**(B) "Commercial Use"**

**{17}** We therefore proceed to consider whether Section 5.7.1 of the Ordinance prohibits Applicant's proposed stockpiling activity. Section 5.7.1 of the Ordinance states, "No commercial districts shall be allowed in the Planning Area. All commercial uses must meet the requirements for home occupations and home businesses as stated in Section 5.9 of this Ordinance."

**{18}** The record before us does not disclose what constitutes a "commercial district." We are therefore required to discern what the Ordinance means when it refers to "commercial uses." Again, we look to the ordinary meaning of what "commercial" means. *See High Ridge Hinkle Joint Venture*, 1998-NMSC-050, ¶ 5. Applicant argues that "commercial" means "of or relating to commerce." We agree. *See Webster's Third New Int'l Dictionary*, *supra*, at 456 (defining "commercial" as "of, in, or relating to commerce"). Applicant then refers us to a definition of "commerce" in *Black's Law Dictionary* (8th ed. 2004) as "[t]he exchange of goods and services, [especially] on a large scale involving transportation between cities, states, and nations." *Webster's Third New International Dictionary*, *supra*, at 456 defines "commerce" as "the exchange or buying and selling of commodities [especially] on a large scale and involving transportation from place to place." From these definitions we conclude that the common meaning of the word "commerce" relates to exchanging goods.

**{19}** Applicant asserts that because he is not exchanging goods on the subject property itself, but simply storing rock and gravel, his proposed use is not "commercial." On the other hand, the Association asserts that stockpiling mined materials pending removal for sale manifestly constitutes a "commercial" use under its ordinary meaning. We are more persuaded by the Association's argument. Applicant testified that he was seeking to stockpile on the subject property so that he could have more material "ready to go whenever [his customers] want it." This testimony demonstrates Applicant's acknowledgment that stockpiling the mined sand and gravel for future sale is "related to" the "buying and selling" of the mined materials.

**{20}** Applicant and the Board both argue that under the second *Hinkle* rule, we should defer to the Board's interpretation of its own ordinance although there is no longstanding interpretation of the Ordinance. *See Alba*, 2004-NMCA-084, ¶ 22. While *Alba* recognizes that case law permits a court to give deference to reasonable agency interpretations of agency-authored ordinances even when the agency's construction is not longstanding, deference was appropriate in *Alba* because there were indications that the county had previously interpreted the ordinance in a way that was consistent with the challenged decision. *See id.* ¶ 23. In contrast, in the present case, not only is this the first time the Ordinance has been definitively construed by the Board, but to the extent that the Board previously construed the Ordinance when it considered Applicant's initial application for the temporary permit, it required that the stockpiles be removed at that time. Finally, we decline to defer to the Board's interpretation because whether stockpiling of mined materials constitutes a "commercial use" presents a question of law which is subject to our de novo review.

7

**{21}**    We therefore conclude that the plain meaning of the prohibition on "commercial uses" in Section 5.7.1 of the Ordinance includes a prohibition of the stockpiling activity proposed by Applicant.   Furthermore, neither Applicant nor the Board argues that the proposed stockpiling activity satisfies "the requirements for home occupations and home businesses as stated in Section 5.9 of this Ordinance."

### (C) "Industrial Use"

**{22}**    The Board decision states that stockpiling is neither a mining nor a commercial use, and is more properly categorized as an "industrial use."  We agree with the district court that the record is devoid of any evidence regarding "industrial use."  The evidence presented to the Board contains no reference to "industrial use," no definition of the term, and no information regarding whether the subject property is zoned for such use.  Because the Board finding that stockpiling constitutes a permissible "industrial use" of the subject property is not supported by substantial evidence, we affirm the order of the district court which reversed the Board finding on this point.

### (D) "Commercial Impracticability"

**{23}**    In our analysis to this point, we have concluded that the Ordinance prohibition on commercial uses in the San Pedro District prohibits the stockpiling of mined material which Applicant proposes.  Perhaps anticipating this result, the Board concluded that to the extent the Ordinance prohibits stockpiling, it violates *Granite Rock* because the prohibition renders Applicant's mining operation on the adjacent federal mining lease commercially impracticable.

**{24}**    In *Granite Rock*, the United States Supreme Court held that it is permissible for a state agency to impose a permit requirement enforcing state environmental regulations on a mining operation located on federal land, and that various federal laws did not preempt the state requirement because its conditions did not conflict with federal law.  480 U.S. at 593.  In its analysis, the Supreme Court described various ways in which a state law may be preempted by federal law, including "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Id.* at 581 (internal quotation marks and citations omitted).  The Supreme Court also hypothesized in dictum that a "severe" state environmental regulation could possibly render a land use "commercially impracticable."  *Id.* at 587.  The Board presumably relied upon these concepts in concluding that if a prohibition on stockpiling on the subject property rendered Applicant's mining operation on the federal BLM mine lease commercially impracticable, the federal use would preempt the prohibition. We assume without deciding that the Federal Mining Act impliedly preempts state regulations of private land which render mining operations on federal land commercially impracticable.

**{25}**    We look to United States Supreme Court decisions to determine what it meant when it used the term "commercially impracticable" in *Granite Rock*.  In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the Supreme Court held that a Pennsylvania statute which

impeded the ability of a mining company to mine coal constituted a regulatory taking and stated, "To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it." 260 U.S. at 414-15. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987), was another case involving the impact of a Pennsylvania statute on mining operations. In that case, the Supreme Court determined that mine operators failed to show that the statute in question rendered their operations commercially impracticable. *Id.* at 493, 495-96. The Supreme Court stated that the *Pennsylvania Coal* "commercially impracticable" language related to the impact of a state regulatory statute on the profitability of a mine. *See Keystone Bituminous Coal Ass'n*, 480 U.S. at 498-99. In *Keystone*, the petitioners did "not come close to satisfying their burden of proving that they have been denied the economically viable use of that property." *Id.* at 499. Furthermore, the petitioners in *Keystone* had not shown that the statute made it "impossible for [them] to profitably engage in their business, or that there [had] been undue interference with their investment-backed expectations." *Id.* at 485.

**{26}** From these decisions we conclude that in order to demonstrate that the Ordinance impermissibly conflicts with federal law, Applicant was required to present substantial evidence in the record that the application of the Ordinance to the subject property rendered the mining operation on the BLM mining lease commercially impracticable. To satisfy this burden Applicant was required to show that enforcement of the Ordinance would deprive him of the economically viable use of the BLM mine lease, that its enforcement would make it impossible for Applicant to profitably engage in his mining operation, or that its enforcement would unduly interfere with his investment-backed expectations.

**{27}** Applicant's testimony did not demonstrate that the mining operation was functioning at only a marginal level or that it would only be commercially feasible if he was allowed to stockpile on the subject property. We therefore conclude that the finding of the Board that allowing Applicant to stockpile on the subject property would render "financially feasible an otherwise marginal mining operation" is not supported by substantial evidence. In fact, the evidence seems to show that Applicant's business was healthy and that the demand for his product was such that he wished to expand his operation by stockpiling on the subject property. While the Board heard testimony that Applicant experienced difficulty in limiting his mining and storage of the sand and gravel to the five acres of BLM land, this evidence does not meet the high standard of "commercial impracticability" that is required.

**{28}** The district court reversed the Board decision in part because of a lack of substantial evidence to establish that the prohibition of commercial uses on the subject property rendered Applicant's mining operation commercially infeasible. We agree with the district court.

**(E) "Temporary Permits"**

**{29}** The Board asserts that the district court erred in finding, in its oral decision, that the Board decision is not in accordance with law because the Ordinance does not contain authority for temporary permits. Ru1e 12-505(D)(3) provides that a petition for a writ or

9

certiorari "shall contain a concise statement showing . . . the questions presented for review by the Court of Appeals; only the questions set forth in the petition will be considered by the Court." The issue now raised was not set forth by either the Board or Applicant in their petitions for certiorari. We therefore do not consider it.

**CONCLUSION**

**{30}** For the above reasons, we the affirm the final order of the district court.

**{31}    IT IS SO ORDERED.**

                        **MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

**JAMES J. WECHSLER, Judge**

**RODERICK T. KENNEDY, Judge**

**Topic Index for *San Pedro Neighborhood Assn. V. SF County BCC*, No. 27,907**

| | |
|---|---|
| **AL** | **ADMINISTRATIVE LAW** |
| AL-AA | Administrative Appeal |
| AL-AL | Administrative Law, General |
| AL-EV | Evidence |
| AL-SC | Scope of Review |
| AL-SR | Standard of Review |
| AL-SE | Sufficiency of Evidence |
| | |
| **GV** | **GOVERNMENT** |
| GV-LU | Land Use |
| GV-OR | Ordinances |
| GV-ZL | Zoning Law |
| | |
| **PR** | **PROPERTY LAW** |
| PR-MR | Mineral Resources |
| PR-PU | Public Lands |