**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-049**

**Filing Date: December 19, 2013**

**Docket No. 32,276**

**PARKVIEW COMMUNITY DITCH
ASSOCIATION,**

      **Plaintiff-Appellee,**

**v.**

**DOUGLAS PEPER AND LANCE PEPER,**

      **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Barbara J. Vigil, District Judge**

Daniel A. Sanchez
Daniel J. Sanchez
Albuquerque, NM

for Appellee

Just Appeals.Net
The Appellate Law Office of Scott M. Davidson, Ph.D.
Scott M. Davidson
Albuquerque, NM

for Appellants

**OPINION**

**BUSTAMANTE, Judge.**

**{1}** This case began its life as a dispute between the Parkview Community Ditch Association and Appellants, the Pepers, concerning placement by the Pepers of a new headgate on the Association's acequia system. The dispute led the Association to seek an injunction to stop the construction. The case mushroomed to include a challenge to the district court's jurisdiction and to implicate the statutes governing acequias and the Open

Meetings Act (OMA). *See* NMSA 1978, §§ 10-15-1 to -4 (1974, as amended through 2013); NMSA 1978, §§ 73-2-1 to -68 (1874, as amended through 2005).

**{2}** We affirm the district court's rulings concerning its jurisdiction and its ultimate decision ordering removal of the structure, but we reverse the district court's order granting attorney fees to the Association. Finally, we remand one of the OMA claims for further consideration.

**BACKGROUND**

**{3}** As context for the facts specific to this case, we provide a brief history of the laws governing acequias in New Mexico.

> New Mexico being in the arid region, the early settlements were established along the banks of perennial rivers, or in the mountain valleys where water from springs and creeks was reasonably certain to be available for irrigation at the needed times. . . . [T]he people built their houses and established their towns and plazas close together, and cultivated the lands in small tracts adjacent to the settlement. . . . [T]he people by their joint effort would construct an irrigation ditch, sufficiently large to convey water to their lands for the irrigation of crops. Each individual owned and cultivated a specific tract of land, sufficient to provide food for the needs of his family, and from the main ditch laterals were run to the various tracts of land to be watered.

*Snow v. Abalos*, 1914-NMSC-022, ¶ 8, 18 N.M. 681, 140 P. 1044; *see generally* Christopher J. DeLara, *Who Controls New Mexico's Acequias? Acequia Government & Wilson v. Denver*, 40 Nat. Resources J. 727, 728 (2000). "The distribution of the water and the repair of the ditch was in charge of a mayordomo, or officer elected by the water users under the ditch." *Snow*, 1914-NMSC-022, ¶ 8. The mayordomo had the authority to "require the water users to contribute labor toward the repair of the ditch and its maintenance, and also distributed the water to the various irrigators equitably, in proportion to the land to be irrigated." *Id.* Today, "[t]he governmental and managerial structure of the acequia is based on the historic management of the acequia[.] . . . The ditch rules that govern acequia affairs . . . for the most part simply codify the norms already imbedded in custom and tradition." DeLara, *supra*, at 728-29 (internal quotation marks omitted).

**{4}** The parties' dispute in the present matter arose when the Pepers, relatively new owners of land served by the ditch, notified the Association of their intent to install a diversion structure in the ditch. In spite of the fact that neither the Association nor the mayordomo, Walter Piña, approved the Pepers' plans, the Pepers installed the structure. The parties disagree as to whether the mayordomo told the Pepers in person that the structure must not be installed and also on whether the structure was built in compliance with the mayordomo's recommendations and/or the Association's bylaws.

2

**{5}** Piña and Pedro Arechuleta, acting as mayordomo and commissioner respectively, sought and obtained a temporary restraining order on behalf of the Association prohibiting the Pepers from continuing work on the ditch and ordering removal of the structure "until all surveys are provided." After a hearing on an order to show cause why the restraining order should not be extended or a preliminary injunction issued, the district court permitted the Pepers to post a $1,000 bond instead of removing the structure and extended the restraining order pending an evidentiary hearing. The Pepers then filed counterclaims alleging violations of the OMA and asserting that the petition was invalid because Piña and Arechuleta were not properly authorized to file it.

**{6}** After two days of evidentiary hearings, the district court rejected the Pepers' counterclaims based on violations of the OMA and ordered the Pepers to submit plans and surveys for the structure to Piña for review. It also required Piña to "issue findings identifying any and all inadequacies . . . in the plans and survey within [fourteen] days of submission[,]" to which the Pepers were required to respond with "a written proposal as to how they would correct any inadequacies or deficiencies identified by the mayordomo." The order provided that the Pepers "shall have ten . . . days to file objections to the [n]otice of [i]nadequacies and [d]eficiencies provided by . . . [the] mayordomo, and if [the Pepers] timely file such objections, the [district c]ourt will resolve the objections as provided by subsequent order." The district court also ordered the Pepers to pay over $21,000 in attorney fees to the Association.

**{7}** The Pepers moved for reconsideration of the order in part and dismissal of the action for lack of standing. They argued that because of the Association's violations of the OMA, neither Piña nor Arechuleta were properly elected and, therefore, they did not have standing to file a petition on behalf of the Association against the Pepers. They maintained that "[i]t is well established in New Mexico that lack of standing under a statutorily created cause of action implicates a court's subject matter jurisdiction." The Pepers also argued that Piña's work inspecting the work on the headgate was void because—based on a number of OMA violations in the 2011 election—he had not been properly elected as mayordomo for the 2012 calendar year. The Pepers also objected to Piña's findings on factual grounds. Based on the OMA violations, they also argued that they, not the Association, were entitled to attorney fees.

**{8}** The district court held a hearing on the motion to reconsider or dismiss and on the Pepers' objections to Piña's findings. After the hearing, the district court found that (1) it had jurisdiction over this matter and denied the motion to reconsider or dismiss, and (2) the Pepers' objections to Piña's findings were "not well taken" and ordered the Pepers to remove the structure. Additional facts are provided as pertinent to our analysis of the issues on appeal.

**DISCUSSION**

**{9}** We begin by addressing the Pepers' arguments pertaining to the OMA. The Pepers

3

assert that, because of the Association's violations of the OMA, Piña and Arechuleta were never properly elected as officers of the Association in 2010 and hence lacked standing to bring the present suit. They argue further that the present suit is invalid because the Association never properly met and voted to initiate the suit. Finally, they argue that Piña was never properly elected as mayordomo in December 2011 for the following year and, therefore, he did not have the authority in 2012 to make findings about the Pepers' structure or to compel compliance with those findings. After a general review of the OMA, we address these arguments in turn.

**{10}** Under the OMA, "it is declared to be public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them." Section 10-15-1(A). "All meetings of any public body except the legislature and the courts shall be public meetings[.]" *Id.* In furtherance of this policy, the OMA requires public meetings, advance notice of the meeting and the agenda, and written minutes of the meeting, to be open to public inspection. *See* § 10-15-1(B), (D), (G). Section 10-15-1(G) provides that written minutes "shall include at a minimum the date, time and place of the meeting, the names of members in attendance and those absent, the substance of the proposals considered and a record of any decisions and votes taken that show how each member voted."

**{11}** "Acequia and community ditch associations are political subdivisions of this state." Section 73-2-28. As such, they fall within the ambit of the OMA. *See* § 10-15-1(B) ("All meetings of a quorum of members of any board [or] commission . . . of any . . . political subdivision, . . . are declared to be public meetings open to the public at all times[.]"); *see also* § 73-2-21(D) ("All proceedings of the commissioners . . . shall be reduced to writing in a book . . . , and all books and papers so kept by the commissioners . . . shall always be . . . public property, and shall be subject to the inspection of all persons therein concerned.").

**{12}** The Association held a meeting in December 2010 to elect officers for the following year. The Pepers do not dispute that the Association publicly announced the meeting and the agenda in advance, nor do they dispute that there was a quorum or that the meeting was open to the public. They maintain instead that the actions at the meeting are invalid because the minutes did not record how each member voted. *See* § 10-15-1(G) (stating that minutes "shall include . . . a record of any decisions and votes taken that show how each member voted"). This position, however, is not consistent with New Mexico law, which requires substantial, not strict, compliance with the OMA. *See Gutierrez v. City of Albuquerque*, 1981-NMSC-061, ¶¶ 13, 15, 96 N.M. 398, 631 P.2d 304.

**{13}** Under the substantial compliance standard, "when the [OMA] has been sufficiently followed so as to carry out the intent for which it was adopted and serve the purpose of the statute[,]" no violation has occurred. *Id.* ¶ 14. The purpose of the OMA is "to provide that governing bodies . . . be required to make decisions in the open where the interested public c[an] observe the action." *Id.* ¶ 8 (quoting *Raton Pub. Serv. Co. v. Hobbes*, 1966-NMSC-150, ¶ 18, 76 N.M. 535, 417 P.2d 32). Although compliance with the OMA's provisions is

4

generally necessary to meet this goal, "[i]t can be said with equal assurance that in enacting the [OMA,] the Legislature did not intend to impair or impede the effective workings of the various political subdivisions of the state."  *Id.* ¶ 12.

**{14}**     An example of substantial compliance is found in *Gutierrez*.  There, the city council held a public meeting in a room that could not accommodate all of the people who wanted to attend.  *Id.* ¶ 3.  Gutierrez sued, alleging that the meeting violated the OMA's requirement that "all persons so desiring shall be permitted to attend and listen to the deliberations and proceedings" at a public meeting.  *Id.* ¶ 4 (internal quotation marks and citation omitted); *see* § 10-15-1(A).  The Supreme Court observed that the city council held its meeting in a large hall, made efforts to allow the overflow crowd to listen to the proceedings, and permitted those present to address the council.  *Gutierrez*, 1981-NMSC-061, ¶ 15.  Rejecting a strict interpretation of the statute, the Court concluded "that the words [attend and listen] mean only that the governmental entity must allow reasonable public access for those who wish to attend and listen to the proceedings."  *Id.*  Thus, in spite of the fact that some people were not able to attend the meeting, the Court held that there was no violation of the OMA and therefore no reason to hold the action taken at that meeting invalid.  *Id.* ¶¶ 2, 15.

**{15}**     We see no reason why the principle of substantial compliance should not apply here. The purpose of the OMA's requirement for recording how each member voted is to allow "the people . . . to know how their representatives vote on important questions."  *State ex rel. Savarese v. Buckeye Local Sch. Dist. Bd. of Educ.*, 660 N.E.2d 463, 466 (Ohio 1996) (internal quotation marks and citation omitted).  This requirement provides accountability for representatives who act on behalf of others.  *See City of King City v. Cmty. Bank of Cent. Cal.*, 32 Cal. Rptr. 3d 384, 404 n.18 (Ct. App. 2005) ("The requirement of a 'recorded vote' in [the statute] is no doubt intended to ensure some measure of accountability on the part of local legislators who approve (or refuse to approve) expenditures of public funds."); *City of Valentine v. Valentine Motel, Inc.*, 125 N.W.2d 98, 101 (Neb. 1963) ("[T]he provisions requiring the recording of the yeas and nays were intended to . . . [ensure] that the public might have the opportunity to know how their councilmen had voted upon the passage of any given ordinance." (emphasis, internal quotation marks, and citation omitted)); *Bd. of Educ. of New Concord Sch. Dist. v. Best*, 39 N.E. 694, 697 (Ohio 1894) ("The purpose [of recording yeas and nays] is to make [those voting] feel the responsibility of their action when these important measures are upon their passage, and to compel each member to bear his share in the responsibility, by a record of his action which should not afterwards be open to dispute." (internal quotation marks omitted)).

**{16}**     Here, Section 73-2-14 provides that "those having water rights in the acequia or ditch and who are not delinquent in the payment of their assessments . . . shall be allowed to vote" for commissioners and the mayordomo.  In the Association's practice, each person meeting these requirements is accorded one vote.  *See Wilson v. Denver*, 1998-NMSC-016, ¶ 43, 125 N.M. 308, 961 P.2d 153 (holding that voting "based on a majority of those using the ditch for the distribution of water" is acceptable).  In this case, the voters do not represent others. Rather, they represent their own interests in the use and maintenance of the ditch.  We

5

conclude that the purpose of recording the "yeas and nays" of votes is not relevant in this context, where the recording of the votes would not serve the purpose of greater accountability. Thus, since the 2010 meeting minutes otherwise substantially complied with the requirements of the OMA, the 2010 election of Arechuleta and Piña is not void.

**{17}** The Pepers' second argument is that the present suit is invalid because Piña and Arechuleta decided to initiate the suit at an unadvertised meeting contrary to the OMA. This argument is unavailing because Section 73-2-64(D) permits the mayordomo, acting alone, to "apply . . . for an injunction restraining any person from" interfering with the ditch. *But see* § 73-2-21(B) (stating that the mayordomo acts under the supervision of the commissioners). Thus, no meeting subject to the OMA was required for the initiation of the present suit by Piña.

**{18}** Finally, the Pepers argue, as they did in their objections to Piña's findings, that "[t]here is no evidence in the record that . . . Pi[ñ]a was in fact elected to office at the [December] 2011 meeting" and conclude that, because Piña was not elected for the 2012 term, he had no authority under Section 73-2-64 to make findings about the adequacy of the structure or to require compliance with the Association's bylaws.[1]

**{19}** The district court's order on the Pepers' objections stated that "the [c]ourt does not find the [o]bjections to be well taken and[] hereby orders the [Pepers] to comply with the [previous o]rder]" and referenced "the mayordomo" several times. But because the district court expressly declined to determine whether Piña was properly elected as mayordomo in 2011, the order is ambiguous as to whether the district court was ordering action by Piña or by the duly elected mayordomo.[2] When an order is ambiguous, we may examine the district court's oral rulings "as instructive in determining the court's intent." *San Pedro Neighborhood Ass'n v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 2009-NMCA-045, ¶ 8, 146 N.M. 106, 206 P.3d 1011 (internal quotation marks and citation omitted). At the hearing, the district court stated, "I find [that,] even if [Piña] were not properly elected in 2011, which I am not making that determination or not, he is the person that the [district c]ourt has charged with reviewing these plans, so he's got the authority for this case to make these decisions." The district court also stated that it was "giving [Piña] th[e] authority [to review the water structure]" and that "[Piña] has [the district court's] authority to decide what is the

---

[1]We note that Section 73-2-12 provides that association officers shall be elected "biennially," which might be construed to indicate that Piña's election in 2010 was valid through 2011 and 2012. Piña testified, however, that the Association holds elections every year. It is unclear from the record whether the Association's bylaws provide for an annual election schedule. Neither party addresses this issue on appeal. For the purposes of this appeal, we assume, as it appears the parties do, that an election in 2011 was necessary in order for Piña to continue as mayordomo in 2012.

[2]The district court adopted the order as submitted by the Association.

correct water unit." We conclude from these statements that Piña was operating under the authority of the court order, not Section 73-2-64, when he reviewed the Pepers' water structure and made findings as to its adequacy.

{20}    We are cognizant of the fact that a properly elected mayordomo would have had the authority to review and approve or identify inadequacies in the Pepers' water structure even if the district court ordered someone else to do it and that such an order could therefore conflict with the statute. *See* § 73-2-21(B)(1) (giving the mayordomo "the superintendence of all work" on the ditch); § 73-2-64(A) (referencing the "order of the mayordomo" with respect to breaking, cutting, or stopping the ditch). Here, however, the Pepers' argument is that there was no one with the authority given by statute. We conclude that the district court's order granting Piña the authority to review the Pepers' water structure did not contravene the acequia statute in these circumstances.

{21}    This conclusion, however, does not resolve the Pepers' claims that violations of the OMA occurred in the election of Piña and the commissioners in 2011. There is no evidence in the record showing that Piña was properly reelected mayordomo after his 2011 term ended. Rather, the district court refused to hear evidence on the issue altogether and stated explicitly that it was not deciding whether Piña was elected for the 2012 term. Instead, it ruled that "[t]he [district c]ourt is not changing its mind on its prior [o]rder on all issues." But because the prior order addressed only the Pepers' arguments as to OMA violations relevant to the 2010 elections and Piña's and Arechuleta's standing to bring suit, we conclude that the district court neither heard nor decided the question of whether the Association's officers were properly elected in 2011. Hence, we remand to the district court for findings on whether the election of officers in 2011 was properly conducted under the OMA.[3]

{22}    In conclusion, the minutes of the 2010 meeting at which Arechuleta and Piña were elected commissioner and mayordomo, respectively, substantially complied with the OMA and therefore the 2010 elections are not void. Thus, Piña had standing to initiate the present suit. Furthermore, no meeting subject to the OMA was required for Piña to do so, since Section 73-2-64(D) permits the mayordomo to pursue an injunction to prevent interference with an acequia. In addition, Piña was operating under the authority of a court order when

---

[3]To the extent that the Association argues that the Pepers failed to timely challenge the elections under NMSA 1978, Section 73-3-3 (1921), which requires that a "notice of contest shall be filed within fifteen days after the result of the election is announced as herein required[,]" we are not persuaded. Section 73-3-3 is inapplicable to the Pepers' challenge because NMSA 1978, Section 73-3-11 (1917) states that "[A]rticle [3] . . . shall [not] apply or be construed to be in force or effect in any of the following counties, viz.: Dona Ana, Grant, . . . Rio Arriba . . . , as the same existed on the 11th day of March, 1903." Since the ditch in question is in Rio Arriba county, the Pepers were not required to file election challenges within fifteen days of the announcement of the results.

he made findings as to the Pepers' water structure. The district court's orders on these issues are affirmed. Finally, because the district court did not hear or rule on the Pepers' claims that the 2011 elections violated the OMA, we remand for further proceedings on that issue. If the Pepers are able on remand to establish that the 2011 elections were held in violation of the OMA, they may be entitled to attorney fees under Section 10-5-3(C).

**{23}** We turn now to the question of whether the grant of attorney fees to the Association was proper. The district court awarded the Association $21,919.93 in attorney fees based on Sections 73-2-23 and 73-2-64(D) of the acequia statute. On appeal, we review the district court's grant or denial of attorney fees for an abuse of discretion. *See In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 6, 140 N.M. 879, 149 P.3d 976. We conclude that the district court misconstrued Sections 73-2-23 and 73-2-64(D) and reverse the grant of attorney fees to the Association. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (stating that a decision based on a "misapprehension of the law" is an abuse of discretion (internal quotation marks and citation omitted)).

**{24}** "New Mexico adheres to the so-called American rule that, absent statutory or other authority, litigants are responsible for their own attorney[] fees." *Id.* ¶ 9 (internal quotation marks and citation omitted). In addition, "'[c]osts' are not generally understood as including attorney[] fees, for purposes of statutes allowing awards of costs, unless the statute or court rule specifically defines costs as including attorney[] fees." 20 Am. Jur. 2d *Costs* § 63 (2013) (footnote omitted); *see N.M. Right to Choose/NARAL*, 1999-NMSC-028, ¶ 4 (treating attorney fees and costs as distinct); *State ex rel. Roberson v. Bd. of Educ. of City of Santa Fe*, 1962-NMSC-064, ¶ 21, 70 N.M. 261, 372 P.2d 832. Finally, "[i]n view of the well-established 'American Rule'[,] . . . courts have often stated that statutory attorney[] fees may be awarded only when 'expressly,' 'explicitly,' or 'specifically' authorized by statute, and that statutes allowing an award of fees will be strictly construed." 1 Robert L. Rossi, *Recovery of Attorney[] Fees from Non-Client Parties*, § 6:7 (3d ed. 2013) (footnotes omitted); *see Duncan v. Henington*, 1992-NMSC-043, ¶ 5, 114 N.M. 100, 835 P.2d 816 ("[I]n general, statutes in derogation of the common law are to be construed strictly. Under this standard, a court will not find the common law superseded unless it appears that it was the legislative intent, which is to be determined primarily by the language of the statute itself." (citation omitted)).

**{25}** Here, the district court relied on Section 73-2-23, which states,

> The commissioner of each acequia shall be entitled to actual expenses incurred while in the performance of their [his] duties. Provided that the maximum rates which may be allowed for travel by privately owned conveyances shall be eight (8) cents per mile and provided further that if more than one commissioner shall travel in the same privately owned conveyances such mileage shall be charged but once.

8

**{26}** It also relied on Section 73-2-64(D), which states that "[t]he remedies provided for in this section shall not be construed as limiting the right of the party bringing the civil or criminal complaint from seeking damages."

**{27}** There is no mention of attorney fees in these sections. Rather, the implication of Section 73-2-23 is that the expenses incurred by commissioners will be reimbursed by the Association. In any case, the mere use of the words "expenses" or "damages" is not sufficient to overcome the "American rule." "If the legislature had desired attorney fees to be reimbursed in this type of case, . . . it would have expressly so provided." *State ex rel. Roberson*, 1962-NMSC-064, ¶ 22 (affirming denial of attorney fees where the applicable statute permitted award of "damages which [the prevailing party] has sustained, together with costs and disbursements"); *see id.* ¶ 16 (internal quotation marks and citation omitted); *see, e.g.*, NMSA 1978, § 39-2-1 (1977) (explicitly authorizing attorney fees and costs); NMSA 1978, § 10-15-3(C) (1997) (same). Thus, the award of attorney fees to the Association is reversed.

## CONCLUSION

**{28}** For the foregoing reasons, we affirm the district court's rulings as to the mayordomo's standing and authority to file the petition and Piña's authority to issue findings of inadequacies in the Pepers' water structure. The grant of attorney fees to the Association is reversed. Finally, we remand for proceedings on the issue of whether the Association's elections for 2012 officers complied with the OMA.

**{29}** **IT IS SO ORDERED.**

 

 

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Judge**

_____

**J. MILES HANISEE, Judge**

**Topic Index for *Parkview Cmty. Ditch Ass'n v. Peper*, No. 32,276**

**APPEAL AND ERROR**
Attorney Fees
Remand

**CIVIL PROCEDURE**

Injunctions
Substantial Compliance

**GOVERNMENT**
Open Meeting Act

**JURISDICTION**
Subject Matter

**NATURAL RESOURCES**
Water Law